# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK



|  |  |  |
|---|---|---|
| MAINE PUBLIC EMPLOYEES RETIREMENT SYSTEM, on behalf of itself and all others similarly situated, | : : : | Civil Action No. |
| | : : | |
| Plaintiff, | : : | |
| | : | JURY TRIAL DEMANDED |
| v. | : : | |
| AMERICAN INTERNATIONAL GROUP, INC., MARTIN SULLIVAN, STEVEN BENSINGER, JOSEPH CASSANO and ROBERT LEWIS, | : : : : : | |
| | : : | |
| Defendants. | : : | |

## CLASS ACTION COMPLAINT

Plaintiff, Maine Public Employees Retirement System ("Plaintiff" or "MainePERS"), by its undersigned counsel, brings this action on behalf of itself and all other similarly situated persons or entities (the "Class"), other than Defendants and their affiliates (as described herein), who purchased or otherwise acquired securities issued by American International Group, Inc. ("AIG" or the "Company"), from May 11, 2007 through May 9, 2008 (the "Class Period"), for violations of the federal securities laws. Plaintiff seeks to recover damages caused to the Class by Defendants' violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). The allegations of this Complaint are based on Plaintiff's personal knowledge as to itself and on information and belief (including the investigation of counsel and review of publicly available information) as to all other matters.

## SUMMARY OF THE ACTION

1.      AIG describes itself as "the leading international insurance organization with operations in more than 130 countries and jurisdictions.  AIG companies serve commercial, institutional, and individual customers through the most extensive worldwide property-casualty and life insurance networks of any insurer.  In addition, AIG companies are leading providers of retirement services, financial services and asset management around the world."  AIG is one of the thirty component companies of the Dow Jones Industrial Average.

2.      This class action involves allegations that AIG and certain of its officers and directors issued a series of false and misleading statements relating to the Company's finances that artificially inflated the price of AIG securities.  AIG reported impressive earnings of $4.39 billion, $4.28 billion and $3.08 billion for the first three quarters of 2007.  Throughout the Class Period, defendants repeatedly assured the market that the Company was well-positioned to continue producing significant earnings, notwithstanding the turmoil during 2007 arising from the meltdown of the U.S. sub-prime residential mortgage market.  In particular, AIG consistently assured investors of the security of its "super senior" credit default swaps ("CDS") portfolio, representing to investors that it was "highly unlikely" to suffer any actual losses as a result of the mortgage meltdown.  CDSs are credit derivatives that, in practice, work much like traditional insurance:  a buyer of a CDS obtains credit protection by paying a fee to transfer the risk of default on a fixed income security to the seller of the swap (in this case, AIG).

3.      Throughout the Class Period, AIG made repeated statements touting the Company's sophisticated and conservative risk management strategies and the effectiveness of such strategies in limiting any foreseeable losses arising from the Company's CDS portfolio.  For example, on August 9, 2007, during the second quarter earnings conference call with

2

analysts, AIG executives represented that the risk undertaken **"is very modest and remote, and has been structured and managed effectively"** and **"[w]e see no dollar loss associated with any of [the CDS] business."** In fact, Defendant Joseph Cassano, the former head of AIG's derivative unit, declared in reference to the Company's CDS portfolio that **"it is hard for us with, and without being flippant, to even see a scenario within any kind of realm of reason that would see us losing $1 in any of those transactions."**

4.      On November 8, 2007, Company executives reiterated that AIG did not expect to pay any losses **"on this carefully structured and well-managed [CDS] portfolio."** Amid such reassurances to the market, AIG, on November 14, 2007, declared its normal quarterly cash dividend and further announced that its Board of Directors had replenished AIG's existing share repurchase program by authorizing the repurchase of an additional $8 billion in common stock. The November 14, 2008 press release continued:  "Based on current market conditions and AIG's continued generation of excess capital, AIG expects to accelerate the repurchase of the remaining $3 billion of the $8 billion authorized earlier in 2007 as market conditions permit."

5.      Further assurances concerning AIG's CDS portfolio were provided at an investor meeting on December 5, 2007, where AIG's Chief Executive Officer, Defendant Martin Sullivan,  stated that the possibility that these swaps would sustain a loss was **"close to zero"** and that AIG's valuation models had proven to be **"very reliable"** and provided AIG **"with a very high level of comfort."**

6.      As Defendants were making these types of representations, they either knew or recklessly ignored facts indicating that AIG faced mounting losses on its CDS portfolio and other instruments linked to the U.S. residential sub-prime mortgage market. The truth about the losses faced by AIG as a result of the deterioration in its CDS portfolio began to emerge in a Form 8-K

3

filing on February 11, 2008. In that filing, AIG revealed to investors that the Company's independent auditor, PricewaterhouseCoopers LLC ("PWC"), had discovered "material weaknesses in [AIG's] internal control over financial reporting and oversight relating to the fair value valuations of the super senior credit default swap portfolio." As a result, AIG was required to drastically modify its method of accounting in its CDS portfolio. By applying the new valuation method, AIG's actual losses on its CDS portfolio more than quadrupled to between $4.5 and $6.0 billion as of November 30, 2007, from the $1.4 billion to $1.5 billion loss valuation first reported by the Company at the December 5, 2007 investor meeting.

7.     Following the February 11 disclosures, AIG stock plunged 12%, from $50.86 per share to $44.74 per share, wiping out $15 billion in shareholder value. According to a *Wall Street Journal* article published the next day, the decline in AIG's stock price was the largest percentage drop sustained by the Company's shares since the 1987 stock market crash. The article also observed: "Late last year, AIG went to great lengths to tell investors about the Company's exposure to sub-prime mortgages and estimated its losses on those instruments would be much smaller . . . ."

8.     Two weeks later, on February 28, 2008, the Company again revised the valuation on this same CDS portfolio, reporting in its Form 10-K filed with the Securities and Exchange Commission ("SEC") an upward modification of cumulative losses in the Company's CDS portfolio of $11.5 billion as of December 30, 2007. Thus, over the course of just three months, AIG's losses on its CDS portfolio appeared to jump from $1.4 to $1.5 billion in December to $4.5 to $6.5 billion in mid-February, to $11.5 billion on February 28. AIG reported a fourth quarter 2007 loss $5.3 billion, **its largest quarterly loss ever**.

4

9.      Furthermore, AIG disclosed, for the first time, that it had notional exposure of over $6.5 billion in liquidity puts that it had written on CDOs linked to U.S. residential subprime mortgages. According to AIG's 2007 10-K, unbeknownst to investors, the Company had been forced to repurchase over $754 million in CDO securities at par value in 2007 pursuant to the terms of the liquidity puts, and that AIG had provided $3 billion in liquidity facilities in case the Company was required by counterparties to repurchase additional CDOs over the next three years. AIG also reported that Defendant Joseph Cassano, the head of the entity responsible for the Company's CDS portfolio, was resigning.

10.     Unfortunately for AIG's investors, these disclosures only marked the beginning of the bad news. On May 8, 2008, AIG announced its first quarter 2008 results, reporting a massive **$7.8 billion loss,** eclipsing the record for worst-performing quarter that had just been established in the previous quarter. Never before had AIG reported back-to-back quarterly losses. The first quarter 2008 loss was due, for the most part, to an astonishing $9.1 billion additional decline in the valuation of the CDS portfolio. AIG admitted that actual losses in its CDS portfolio were now estimated to be $2.4 billion. The Company also disclosed that it had sustained capital losses of $6.09 billion primarily from other-than-temporary impairment charges relating to certain residential mortgage-backed securities and other structured securities. It also reported that it would be seeking to shore up its finances by raising $12.5 billion through the sale of new stock and fixed-income securities. AIG also announced that its CFO, Defendant Steven J. Bensinger, would be stepping down to assume another position within the Company.

11.     These revelations sent shares tumbling 13% over the next two trading days, from $44.15 to $38.37 per share, eliminating an additional $14.4 billion in AIG's market capitalization.

12.     Defendants' knowing or reckless failure to disclose the true losses arising from AIG's CDS portfolio artificially inflated the price of AIG stock throughout the Class Period, which reached as high as $72.54 per share on June 5, 2007.  In wake of AIG's February 2008 and May 2008 disclosures, tens of billions of dollars in shareholder value has been lost, inflicting substantial damage to the Class, for which recovery is now sought.

## PARTIES

13.     Plaintiff, Maine Public Employees Retirement System, administers retirement programs that cover, among others, Maine public employees, public school teachers, and employees of approximately 267 municipalities and other public entities in Maine.  As of June 30, 2007, MainePERS managed assets of approximately $11 billion and serviced over 93,000 members including active employees and retirees.  MainePERS purchased shares of AIG during the Class Period as set forth in the attached certification and was injured thereby.

14.     Defendant American International Group, Inc. ("AIG" or "the Company") is a Delaware corporation with its principal executive offices located at 70 Pine Street, New York, New York.  AIG trades on the New York Stock Exchange and, as of April 30, 2008, had 2.49 billion common shares of AIG stock outstanding.

15.     Defendant Martin J. Sullivan ("Sullivan") served as the President and Chief Executive Officer of AIG at all times relevant to the Class Period.

16.     Defendant Steven J. Bensinger ("Bensinger") served as the Executive Vice President and Chief Financial Officer of AIG at all times relevant to the Class Period.

17.     Defendant Joseph Cassano ("Cassano") served as head of AIG's Financial Products division ("AIGFP") at all times relevant to the Class Period.

6

18.     Defendant Robert Lewis ("Lewis") served as AIG's Senior Vice President and Chief Risk Officer at all times relevant to the Class Period.

19.     Sullivan, Bensinger, Cassano and Lewis are referred to collectively herein as the "Individual Defendants," and, together with AIG, are referred to as the "Defendants."

## JURISDICTION AND VENUE

20.     The claims asserted herein on behalf of the Class arise under Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5).

21.     This court has jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. §§ 1331 and 1337.

22.     Venue is proper in this district pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).   Many of the acts and transactions giving rise to the violations of law complained of herein occurred in this district.

23.     In connection with the acts, conduct and other wrong complained of herein, defendants, directly of indirectly, used the means and instrumentalities of interstate commerce, the United States mails, and the facilities of a national securities market.

## CLASS ACTION ALLEGATIONS

24.     Plaintiff brings this action on its own behalf and as a class action pursuant to Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedures on behalf of all persons or entities (the "Class") who purchased or acquired AIG securities during the period from May 11, 2007 through and including May 9, 2008 ("the Class Period") and who suffered damages as a result.

25.     Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of each of the Defendants; (iii) any person who was an executive officer and/or director of

AIG during the Class Period; (iv) any person, firm, trust, corporation, officer, director, or any other individual or entity in which Defendant has a controlling interest or which is related to or affiliated with any of the Defendants; and (v) the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

26.    The members of the Class, purchasers of AIG securities, are so numerous that joinder of all members is impracticable. While the exact number of Class members can only be determined by appropriate discovery, Plaintiff believes that Class members number in the thousands, if not higher. As of April 30, 2008, AIG reported that it had 2.49 billion shares of common stock issued and outstanding.

27.    Plaintiff's claims are typical of the claims of members of the Class. Plaintiff and all members of the Class sustained damages as a result of the conduct complained of herein.

28.    Plaintiff will fairly and adequately protect the interest of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests that are contrary to or in conflict with those of the members of the Class that Plaintiff seeks to represent.

29.    A class action is superior to the other methods for the fair and efficient adjudication of this controversy. Because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members individually to seek redress for the wrongful conduct alleged herein.

30.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are:

a.      Whether the federal securities laws were violated by Defendants acts as alleged herein;

b.      Whether documents, including the Company's SEC filings, press releases and other public statements made by Defendants during the Class Period contained misstatements of material fact or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

c.      Whether the market price of AIG stock during the Class Period was artificially inflated due to the material misrepresentations and/or non-disclosures complained of herein;

d.      With respect to Plaintiff's claims under Section 10(b) of the Exchange Act, whether Defendants acted with the requisite state of mind in omitting and/or misrepresenting material facts in the documents filed with the SEC, press releases and public statements;

e.      With respect to Plaintiff's claims pursuant to Section 20(a) of the Exchange Act, whether the Defendants named in those counts are controlling persons of the Company; and

f.      Whether the members of the Class have sustained damages as a result of the misconduct complained of herein and, if so, the appropriate measure thereof.

31.      Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

32.      The names and addresses of the record owners of AIG shares purchased during the Class Period, are obtainable from information in the possession of the Company's transfer

9

agent(s). Notice can be provided to such record owners via first class mail using techniques and a form of notice similar to those customarily used in class actions.

## FACTUAL ALLEGATIONS

**A.    AIG'S EXPOSURE TO THE SUB-PRIME MORTGAGE MARKET**

33.    Sub-prime mortgages consist of residential home loans extended to borrowers who, pursuant to certain underwriting guidelines, do not qualify for "first tier" interest rates. These underwriting guidelines typically include a variety of factors, including the borrower's credit history, income, assets, and amount of equity in the residential property. Sub-prime mortgages carry higher interest rates because of their increased risk and higher rate of default. Other non-prime mortgages products, sometimes referred to as "Alt-A" loans, are offered to borrowers with purportedly prime credit, but who, for various reasons, do not meet the underwriting standards to qualify as prime loans that are eligible for sale to Freddie Mac and Fannie Mae in the secondary mortgage market.

34.    AIG participates in the residential mortgage market in at least four significant ways. First, AIG, through its subsidiary American General Finance, Inc., originates mortgages, including first-lien and second-lien residential sub-prime mortgages. Second, AIG's insurance and financial subsidiaries invest in collateralized debt obligations ("CDOs") and mortgage-backed securities which utilize residential mortgage loans as collateral. Third, AIG acts as a securitizer of sub-prime mortgages, which it packages into various securities, including CDOs, that it sells to investors. Fourth, AIG, through its subsidiaries, acts as an insurer for investors looking to hedge risk on debt instruments (such as CDOs) tied to the residential mortgage market.

35.    AIG Financial Products ("AIGFP"), a subsidiary of AIG, issues credit protection through "credit default swaps" on select senior CDOs. These "credit default swaps" or "CDSs" are used by investors to hedge risk exposure on CDOs and other debt securities. CDSs are derivative instruments, in which one party agrees, for a periodic fee, to assume the risk of non-payment on an underlying asset. In the event of a default on the underlying asset, the seller of the CDS is obligated to compensate the purchaser of the credit protection for the defaulted amounts.

36.    The value of a CDS is derived from the quality of the underlying asset. The price of a swap is set by the expected likelihood of a default and the probable amount of the loss, or the "loss severity." The "value" of the swap, is therefore the amount of payments due the seller over the life of the swap, less the likely default payments the seller will owe the purchaser. As the amount of the default payments increases, the value of the swap decreases.

37.    Stated another way, because AIG is the seller of credit protection through CDSs, AIG's CDS portfolio consists of "derivative liabilities." As the value of the underlying CDO or other source of payments goes up, the potential liability of the CDS seller goes down. The lower potential liability means more of the premium AIG received in selling the credit protection is available as earnings. However, the inverse is also true. As the underlying credit goes down, more of AIG's premiums will be used to pay for losses, and the Company's earnings will diminish as a result.

38.    As investors would eventually discover, AIG, through AIGFP, was the counterparty of credit default swaps hedging the risk of failure to pay or other credit condition for at least $527 billion in debt, including over $78 billion in CDOs as of December 31, 2007.

11

39.     Accounting for derivative instruments, including CDSs, is governed by Statement of Financial Accounting Standard ("FAS") 133. FAS 133 requires that derivative instruments such as credit default swaps be "marked to market" at the end of each reporting period. This means that the derivative is valued on a company's books at its current market value, with any gains or losses from the prior period increasing or decreasing current earnings.

40.     FAS 107, as amended by FAS 133, requires a company to "disclose, either in the body of the financial statements or in the accompanying notes, the fair value of financial instruments for which it is practicable to estimate that value." Quoted market prices are the best evidence of fair value.

41.     Where there are no quoted market prices, as was usually the case with AIG's CDSs, AIG would "mark-to-model." The Company would estimate the fair value of its CDS based on inputs and assumptions taken from current market indicators of comparable investments. This mark-to-model approach was allowed so long as the fair value estimate is "practicable."

42.     According to AIG's form 10-K for 2006, AIG performed the required market value assessment on its derivative instruments under the following stated policy:

*Fair Value Determinations of Certain Assets and Liabilities (Financial services):*

- Valuation models: utilizing factors, such as market liquidity and current interest, foreign exchange and volatility rates.

- Market price data: AIG attempts to secure reliable and independent current market price data, such as published exchange rates from external subscription services such as Bloomberg or Reuters or third –party broker quotes for use in its models. When such data is not available, AIG uses an internal methodology, which includes interpolation from verifiable recent prices.

**B.    AIG'S FRAUDULENT PORTRAYAL OF ITS FINANCIAL CONDITION AND CDS EXPOSURE**

43.    On May 10, 2007, after the market closed, AIG announced its financial results for the first quarter of 2007 and filed its Form 10-Q with the SEC (the "2007 First Quarter Form 10-Q"). The Company reported net income of $4.13 billion or $1.58 per diluted share, compared to $3.20 billion or $1.22 diluted share in the first quarter of 2006. AIG shares closed up on the reported financial results to $72.58 per share from their previous close of $72.20.

44.    In addition to reporting net income, the Company also reported adjusted net income, which purported to exclude the effects of FAS 133 losses of $205 million. These losses were attributed to the "effect of hedging activities that did not qualify for hedge accounting treatment under FAS 133 or for which hedge accounting was not applied, including the related foreign exchange gains and losses. In the first quarter of 2007, AIG began applying hedge accounting for certain transactions, primarily in its Capital Markets operations." Thus, the loss was attributed to fluctuations in the value of its own economic hedges, rather than derivative securities portfolios held by AIG.

45.    Both Sullivan and Bensinger certified the 2007 First Quarter Form 10-Q, representing, *inter alia*: (i) that AIG's 2007 First Quarter Form 10-Q "[did] not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading;" (ii) that "the financial statements, and other financial information included in [the Form 10-Q] fairly present[ed] in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented;" and (iii) that they had "[d]esigned such internal controls over financial reporting, or caused such internal control over financial reporting to be designed under [their] supervision, to provide reasonable

13

assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."

46.    These certifications, along with the disclosures in AIG's press release and 2007 First Quarter Form 10-Q, were materially false and misleading in that they failed to disclose, *inter alia*:

(a)    the losses associated with AIG's CDS portfolio;

(b)    the true extent of CDS to exposure sub-prime residential mortgages; and

(c)    that AIG lacked adequate internal controls over financial reporting and oversight relating to the fair value valuations of its super senior CDS portfolio.

47.    As the wave of defaults and bankruptcies associated with the sub-prime mortgage market intensified during the spring and summer of 2007, AIG sought to reassure investors that the Company's sub-prime exposure was not a cause for concern. On August 8, 2007, after the close of the market, AIG issued its second quarter 2007 earnings release and Form 10-Q for the quarter ended June 30, 2007 ("2007 Second Quarter Form 10Q"). The Company reported net income of $4.28 billion or $1.64 per diluted share, compared to $3.19 billion or $1.21 diluted share in the first quarter of 2006. In the press release accompanying the Company's earnings, CEO Sullivan assured investors that "**[AIG] continue[s] to be very comfortable with our exposure to the U.S. residential mortgage market, both in our operations and our investment activities**. However, in recognition of the significant investor interest in this topic, we will provide a presentation during our earnings call." (emphasis added.)

48.    AIG participants on August 9, 2007 conference call included Defendants Martin Sullivan, Joseph Cassano, and Robert Lewis. Defendants used the conference call to make a special presentation concerning the impact of developments in the U.S. residential real estate

14

market on the Company.  Defendants sought to allay investors' concerns by deliberately or recklessly misrepresenting that no losses had been realized on AIG's CDS portfolio and that there was no reasonable scenario for such losses to occur in the future.  For example, Robert Lewis, AIG's Senior Vice President and Chief Risk Officer, told investors that:

> AIGFP's exposure to the market is derived through two sources.  First, they write **extremely risk-remote super senior or AAA-plus credit protection on highly-diversified pool of assets,** some of which include residential mortgages.  Second, they are cash investors in highly-rated securities where some portion of the underlying collateral, which may include collateral from many sectors, includes residential mortgages.  While both of these activities involve significant notional exposure, **the risk actually undertaken is very modest and remote, and has been structured and managed effectively.**  AIGFP has been running a successful business of writing super senior credit default swaps, or CDS protection, since 1998.  As of June 30 this year, they had a total net CDS exposure across all asset classes of $465 billion.  The super senior portion is the least likely to incur any losses in these deals, since losses are allocated on a sequential basis from lowest to highest quality.  **Before AIGFP would be at risk for its first dollar of loss, these structures would have to experience exceptional losses that eroded all of the tranches below the super senior level, including a very significant AAA layer of protection.**
>
>              *                           *                         *
>
> **[W]ith super senior protection, we're talking about a very remote risk,** which is defined and calculated not just by rating agency models, but also by our own very rigorous internal models used on each deal AIG-FP structures.

49.     Defendant Sullivan reinforced these comments, stating:

> **AIG's Financial Products portfolio of super senior credit default swaps is well structured; undergoes ongoing monitoring, modeling, and analysis; and enjoys significant protection from collateral subordination.**  Certainly, we will be following this market closely during this period of volatility and correction, and we will continue to manage these risks carefully.

50.     Similarly, Defendant Cassano, then-head of AIGFP, stated unequivocally that there was no reasonable scenario under which losses stemming from AIG's CDS business could be foreseen:

It is hard to get this message across but these [credit default swaps] are very much handpicked. We are very much involved in the process of developing the portfolios in which we are going to wrap, and then picking the attachment points. People have been willing to work with us in order to do that, to create the value that they do in these underlyings. So the combination of the diversity, the combination of the underlying credit quality, and then the stresses that we put it through -- to make sure that we can hit these marks -- **it is hard for us with, and without being flippant, to even see a scenario within any kind of realm of reason that would see us losing $1 in any of those transactions.**

Cassano concluded the investor conference, stating:

We wanted to make sure in this presentation, we broke out exactly what everything looked like in order to give everybody the full disclosure. But we see no issues at all emerging. We see no dollar of loss associated with any of that [credit default swap] business. **Any reasonable scenario that anyone can draw, and when I say reasonable, I mean a severe recession scenario that you can draw out for the life of those securities.**

51.     The message conveyed to the investment community was clear:  the sub-prime mortgage crisis posed no significant threat to AIG.  Reporting on the conference call, the *Wall Street Journal*, in an August 13, 2007 article, observed that:

Exotic financial instruments linked to subprime mortgages are showing huge losses in debt markets and weighing on companies from lenders to bankers to insurers. But not at American International Group Inc. – or so its executives say. The insurance giant did its best to reassure markets late last week that it wasn't going to get slammed by the crisis gripping mortgage and debt markets. Although AIG sees mortgage delinquencies rising executives said during an earnings conference call that the bulk of its mortgage insurance and residential loans aren't at risk. **The company also said it didn't see problems related to a kind of insurance contract, or derivative, it has written against financial instruments that include some subprime debt.** AIG based its all-clear signal for those derivatives on the fact that its internal models show that losses are extremely remote in the portions of the investment vehicles it's insuring. **No likely loses means no reason to worry, the company reasoned... Stock analysts seem satisfied by the Company's response that there isn't a problem.**

52.     As they did with the 2007 First Quarter Form 10-Q, Sullivan and Bensinger certified the 2007 Second Quarter Form 10-Q, representing, *inter alia*:  (i) that AIG's 2007 Second Quarter Form 10-Q "[did] not contain any untrue statement of a material fact or omit to

16

state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading;" (ii) that "the financial statements, and other financial information included in [the Form 10-Q] fairly present[ed] in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented;" and (iii) that they had "[d]esigned such internal controls over financial reporting, or caused such internal control over financial reporting to be designed under [their] supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."

53.    The statements made by the Defendants on the August 9, 2007 earnings conference call, and in the earnings press release and 2007 Second Quarter Form 10-Q, were materially false and misleading in that they failed to disclose, *inter alia*:

> (a)    the losses associated with AIG's CDS portfolio;
>
> (b)    the true extent of CDS exposure to sub-prime residential mortgages; and
>
> (c)    that AIG lacked adequate internal controls over financial reporting and

oversight relating to the fair value valuations of its super senior CDS portfolio.

54.    Defendants knew or should have known that the deterioration of the credit quality of the assets underlying their CDS portfolio had declined to a point where significant defaults were a near certainty, and that the market value of the portfolio itself had declined substantially. Defendants also knew or should have known that it was unreasonable to expect no losses from these investments. Any legitimate procedure for evaluating the expected losses would have demonstrated probable and estimable losses that should have been taken in the first and second quarters, as well as when the statements were made.

55.    On November 7, 2007, AIG announced its financial results for the third quarter of 2007 and filed its Form 10-Q with the SEC (the "2007 Third Quarter Form 10-Q").  The Company reported net income of $3.09 billion or $1.19 per diluted share.  In its press release, AIG acknowledged that the U.S. residential mortgage and credit market conditions had adversely impacted results for the quarter, but nevertheless maintained that "our active and strong risk management processes helped contain the exposure."  AIG acknowledged a small operating loss ($352 million) arising principally from an "unrealized market valuation loss related to its super senior credit default swap portfolio."  Significantly, however, AIG continued to maintain that it there was no likelihood that actual payments would need to be made on any of its CDSs: "Although GAAP requires that AIG recognize changes in valuation for these derivatives, AIG continues to believe that it is **highly unlikely** that AIGFP will be required to make any payments with respect to these derivatives."

56.    Again, AIG executives held an investor conference call in which they steadfastly maintained that there was virtually no risk that the Company would be required to make any payments on its CDS portfolio.  As CEO Sullivan stated::

> The loss taken this quarter reflects a change in the fair value of these derivatives due to the significant widening of credit spreads on the underlying collateral. **However, it does not reflect a change in our view.  AIG does not expect to pay any losses on this carefully structured and well-managed portfolio.**  All Super Senior transactions are written to a zero loss standard; underlying collateral assets analyze the model to determine appropriate risk attachment points to that all transactions have significant subordination below AIG-FP's attachment point.

57.    Similarly, AIG's Senior Vice President and Chief Risk Officer, Defendant Robert Lewis, declared:  "Although a valuation loss has been taken in the quarter to reflect credit spread widening of CDOs of ABS, AIG-FP does not expect to make any payments on its portfolio with

18

Super Senior credit derivatives. . . [t]he ultimate credit risk actually undertaken is remote and has been structured and managed effectively."

58.    As with each of AIG's other 2007 quarterly filings, Defendants Bensinger and Sullivan certified in the 2007 Third Quarter Form 10-Q, *inter alia*:  (i) that AIG's 2007 Third Quarter Form 10-Q "[did] not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading"; and (ii) that "the financial statements, and other financial information included in [the Form 10-Q] fairly present[ed] in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented;" and  (iii) that they had "[d]esigned such internal controls over financial reporting, or caused such internal control over financial reporting to be designed under [their] supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."

59.    The statements made by the Defendants on the August 9, 2007 earnings conference call, and in the earnings press release and 2007 Second Quarter Form 10-Q, were materially false and misleading in that they failed to disclose, *inter alia*:

(a)    the losses associated with AIG's CDS portfolio;

(b)    the true extent of CDS exposure to sub-prime residential mortgages; and

(c)    that AIG lacked adequate internal controls over financial reporting and oversight relating to the fair value valuations of its super senior CDS portfolio.

60.    Indeed, the relatively modest losses for September and October 2007 reported by AIG in its portfolio of credit default swaps were calculated using a valuation model that was

inadequate under GAAP because it was based on generic credit spreads on asset-backed securities, rather than any actual market data. AIG's reported losses in its portfolio of credit default swaps would have been substantially higher had AIG utilized the more appropriate market-based valuation model instead of relying on "generic" credit spreads.

61.    On December 5, 2007, AIG held an investor meeting to discuss its exposures to the U.S. residential mortgage market. During this meeting, AIG disclosed, for the first time, that the value of its super senior credit default swap portfolio had declined between $1.05 and $1.15 billion since September 30, 2007. Taking the disclosures of these losses together with the prior disclosures of losses in the third quarter Form 10-Q, AIG led shareholders to believe that the total disclosed decline in value of AIG's "super senior" credit default swap portfolio for 2007 through November was between $1.4 and $1.5 billion. AIG later confirmed this disclosure in its Form 8-K/A filed with the SEC on December 7, 2007.

62.    During this investor meeting, Defendant Sullivan told shareholders that the possibility that the swaps would sustain a loss was "**close to zero**" and that AIG is "confident in [its] marks and the reasonableness of [its] valuation methods." Mr. Sullivan also told investors that AIG had "a high degree of certainty in" the losses that AIG had "booked to date" and that the Company's U.S. residential housing market exposure levels "are manageable given AIG's size, financial strength and global diversification." With respect to the valuation models, Mr. Sullivan claimed AIGFP's models **"have proven to be very reliable" and "provide AIG with a very high level of comfort."** Mr. Sullivan concluded that "AIG has accurately identified all areas of exposure to the U.S. residential housing market."

63.    These misleading statements made on December 5, 2007 to shareholders had a positive effect on AIG's stock. As the *Wall Street Journal's* blog, *MarketBeat*, reported that same day:

> AIG's stock was the leading Dow component out of the gate, opening at $58 a share, up $2.55, or 4.6%, from Tuesday's $55.45 close. The rally was bolstered by statements from company executives during today's session that its exposure to housing is 'manageable,' **and that it has no exposure to structured investment vehicles**, which hold a big load of the odorous mass known as collateralized debt obligations…Of course, the markets have heard this sort of thing before – losses expected to be contained weren't; exposures that looked healthy were less so – but **saying one has no exposure, that's a bit more definitive.**

64.    Defendants' statements at the December 5, 2007 investor meeting and it the December 7, 2007 Form 8-K were false and misleading because, *inter alia*:

(a)    Losses to AIG's super senior credit default swap portfolio in October and November 2007 were in excess of $4 billion greater than what AIG disclosed to investors at the December 5 Investor Meeting and in the December 7 Form 8-K;

(b)    AIG hid its true losses in its super senior credit default swap portfolio in October and November 2007 by netting against those losses $4.36 billion in offsets from supposed "cash flow diversion features" and "negative basis adjustment," which netting was never disclosed to investors at the December 5 Investor Meeting or in the December 7 Form 8-K;

(c)    All of $3.6 billon-plus in "negative basis adjustments" that AIG utilized to hide actual super senior credit default swap portfolio losses in October and November 2007 were improper;

(d)    More than 50% of the cash flow diversion features that AIG utilized to hide actual super senior credit swap portfolio losses in October and November 2007 were improper; and

21

(e) AIG had a "material weakness" in its internal controls over financial reporting related to the fair value of its super senior credit default swap portfolio at the same time AIG disclosed losses for this swap portfolio at the December 5 Investor Meeting and in the December 7 Form 8-K.

## C.    THE TRUTH CONCERNING AIG'S CDS EXPOSURE, LOSSES AND ACCOUNTING BEGINS TO EMERGE

65.    On February 11, 2008, in its Form 8-K ("February 11, 2007 Form 8-K"), AIG admitted that its credit swap portfolio losses were understated and that material information previously supplied to the market required correction.

66.    As reported in the February 11, 2007 Form 8-K, AIG's gross cumulative decline in valuation for its credit swap portfolio through November 30, 2007 was actually **$5.96 billion, more than $4 billion greater than the net figure reported to shareholders in December 2007**.

67.    As reported in the February 11, 2007 Form 8-K, utilization of the "cash flow diversion feature" and "negative basis adjustment" in AIG's December disclosures reduced the $5.964 billion dollars in "gross" losses down to approximately $1.4 to $1.5 billion in losses, which AIG disclosed in its December 7 Form 8-K. This was the first time AIG utilized these two techniques in this manner, according to the February 11 Form 8-K. In fact, AIG had previously informed the market that prior to the December disclosures, the Company believed it could not reliably estimate the value of the "cash flow diversion features" and thus did not utilize either feature in calculating the value of its credit swap portfolio as of September 30, 2007 and as of October 31, 2007, when it reported losses in the CDS portfolio at those intervals in its 2007 Third Quarter Form 10-Q. However, faced with enormous gross losses, AIG quickly reversed this position at the time of the December 5 investor meeting and reported that, for the first time,

AIG was able to utilize these features on a net basis to reduce reported losses by $732 million. AIG also admitted that the December 2007 disclosures represented the first time AIG began to net its losses in its credit swap portfolio against $3.63 billion by utilizing "negative basis adjustments." These negative basis adjustments, which the Company claimed were intended to reflect the spread differential between the spreads implied from cash CDO prices and credit spreads implied from the pricing of CDS on the CDOs, had the effect of making the Company's CDS losses appear much less substantial – by several billion dollars – than they actually were.

68.    Significantly, AIG's 2007 Third Quarter Form 10-Q failed to discuss the use of "negative basis adjustments" by AIG in calculating the value of its credit swap portfolio at that time. As reported in the February 11, 2007 Form 8-K, AIG admitted that it did not have grounds to utilize the $3.63 billion "negative basis adjustment" (which AIG used in its December disclosures to significantly reduce reported credit swap portfolio losses) going forward in AIG's upcoming Form 10-K for the year-end 2007.

69.    As reported in the February 11, 2007 Form 8-K, the super senior credit default swap portfolio losses reported in AIG's third quarter 2007 Form 10-Q were calculated using a modified Binomial Expansion Technique ("BET") that incorporated "generic" valuation inputs, as opposed to observed market-based inputs, that AIG later adopted to calculate its losses, including "cash bond prices provided by the managers of the underlying CDO collateral pools, or, where not provided by the managers, prices derived from a price matrix based on cash bond prices that were provided." AIG further admitted in this report that the type of generic valuation methodology that was the basis of its loss disclosures in the Company's 2007 Third Quarter Form 10-Q resulted in dramatically lower loss calculations as compared to market-based valuation that AIG later implemented. Significantly, the February 11, 2007 8-K indicates that

AIG's reported gross loss through November 30 would have been 57 percent less if AIG had relied on the generic valuation methodology.

70. Finally, as reported in the February 11, 2007 Form 8-K, AIG was advised by its auditors, PricewaterhouseCoopers LLC ("PWC"), that "they have concluded that at December 31, 2007, AIG had a material weakness in its internal control over financial reporting and oversight relating to the fair value valuation of the super senior credit default swap portfolio."

71. On February 12, 2008, the *Wall Street Journal* reported on these developments:

The finding by AIG's auditors PricewaterhouseCoopers LLP forced the big insurer to lower the value of insurance contracts it holds by an estimated $4.88 billion, before tax. Late last year, AIG went to great lengths to tell investors about the Company's exposure to subprime mortgages and estimated its losses on those instruments would be much smaller just above $1 billion for October and November.

Investors sold AIG's shares aggressively, sending them down $5.94, or 12%, to $44.74, a five-year low, and below its nadir during its accounting sandal. The decline wiped out $15 billion in stock market value and was the biggest percentage drop for AIG's shares since the 1987 stock-market crash. AIG's shares have lost a third of their value in the past year and are down 23% this year. Bond-rating firm Fitch Ratings announced yesterday that it is putting AIG's issuer default rating on "negative" watch.

72. Unbeknownst to investors, but not to Defendants, the February 11 disclosures did not reveal the full extent of the losses that AIG would be required to incur on its CDS portfolio. Over the next several months, investors would slowly learn the staggering amount of losses that were fraudulently withheld from the investing public.

73. On February 28, 2008, AIG filed its Form 10-K for year-end 2007 ("2007 Form 10-K"), which included additional disclosures demonstrating that the Company's prior statements regarding losses on its credit swap portfolio had been false and misleading. As reported in the 2007 Form 10-K, just weeks after Defendants' prior statements, AIG announced

that the cumulative value of its credit default swap portfolio dropped by $11.5 billion. As a result, the fourth quarter of 2007 represented AIG's largest quarterly loss ever of $5.3 billion.

74.    AIG effectively conceded in its 2007 Form 10-K and fourth quarter 2007 earnings call on February 29, 2008, that the offsets it had previously used to reduce the Company's reported losses were improper. Accordingly, AIG reduced or eliminated these offsets from its loss calculations. Specifically, AIG conceded in the 2007 Form 10-K that it did not have a basis to apply the $3.63 billion in "negative basis adjustments" previously used in its December 2007 disclosures to reduce reported loss in value of the credit default swap portfolio. On the February 29, 2008 conference call, Defendant Bensinger admitted that, despite using the negative adjustments to report the CDS portfolio's third quarter losses, "AIG concluded that recording a negative basis adjustment at this time is not consistent with GAAP fair value requirements." On February 29, 2008, AIG also conceded in its fourth quarter earnings call that the "cash flow diversion features" used in its December 7, 2007 and February 11, 2008 disclosures to reduce reported loss in value of its credit default swap portfolio were improper.

75.    The 2007 Form 10-K also reported, for the first time, that AIG's credit default swap portfolio included **$6.5 billion in liquidity puts written on CDOs linked to the sub-prime mortgage market.** These put agreements required AIGFP to purchase certain CDOs at par, provided the securities did not suffer a default. These put agreements represented substantial near-term liabilities. Owners of these puts would not likely exercise them until it was apparent that a default on the underlying collateral was imminent or at least likely. AIG would than have to take back the underlying assets in exchange for only the CDS price it had received when the credit quality of the assets was considered much higher. In other words, the puts

allowed purchasers of the sub-prime CDOs to force AIG to buy them back at the original price, despite the fact they had declined in value.

76.    Beyond disclosing the mere existence of the liquidity puts, the 2007 Form 10-K also reported for the first time that **AIG had actually repurchased $754 million of these securities in 2007**, and that the Company had provided third-parties with **$3 billion** in liquidity facilities in case AIGFP was required to repurchase additional CDOs over the next three years. These liquidity puts further demonstrate that Defendants knew or recklessly disregarded AIG's exposure to the sub-prime mortgage market during 2007, as the liquidity puts are telling evidence that AIG was aware during the Class Period that the market for structured finance products such as CDOs had become significantly less liquid.

77.    The 2007 Form 10-K also included a letter from AIG's audit firm, PWC, confirming that AIG's internal controls, relating to the AIGFP super senior credit default swap portfolio valuation process, had a material weakness and were ineffective:

> Also in our opinion, AIG did not maintain, in all material respects, effective internal control over financial reporting as of December 31, 2007, based on criteria established in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organization of the Treadway Commission (COSO) because a material weakness in internal control over financial reporting related to the AIGFP super senior credit default swap portfolio valuation process and oversight thereof existed as of that date. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented or detected on a timely basis.

> \*                    \*                    \*

> A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting an the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the

transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention of timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

78.    The 2007 Form 10-K further stated that AIG agreed with its auditors' assessment that the Company's disclosure controls and procedures were ineffective as of December 31, 2007. The report concurred that AIG's controls over the AIGFP super senior credit default swap portfolio valuation process and oversight thereof "were not adequate to prevent or detect misstatements in the accuracy of management's fair values estimates and disclosures on a timely basis, resulting in adjustments for purposes of AIG's December 31, 2007 consolidated financial statements."

79.    The 2007 Form 10-K reported specifically on AIG's material weakness:

During the evaluation of disclosure controls and procedures as of December 31, 2007 conducted during the preparation of AIG's financial statements to be included in this Annual Report on Form 10-K, a material weakness in internal control over financial reporting relating to the fair value valuation of the AIGFP super senior credit default swap portfolio was identified.  As a result of this material weakness, described more fully below, AIG's Chief Executive Officer and Chief Financial Officer concluded that, as of December 31, 2007, AIG's disclosure controls and procedures were ineffective.

Management of AIG is responsible for establishing and maintaining adequate internal control over financial reporting.  AIG's internal control over financial reporting is a process, under the supervision of AIG's Chief Executive Officer and Chief Financial Officer, designed to provide reasonable assurance regarding the reliability of financial and the preparation of AIG's financial statements for external purposes in accordance with GAAP.

                    *                    *                    *

As of December 31, 2007, controls over the AIGFP super senior credit default swap portfolio valuation process and oversight thereof were not effective.  AIG had insufficient resources to design and carry out effective controls to prevent or

27

detect errors and to determine appropriate disclosures on a timely basis with respect to the processes and models introduced in the fourth quarter of 2007. As a result, AIG had not fully developed its controls to assess, on a timely basis, the relevance to its valuation of all third party information. Also, controls to permit the appropriate oversight and monitoring of the AIGFP super senior credit default swap portfolio valuation process, including timely sharing of information at the appropriate levels of the organization, did not operate effectively. As a result, controls over the AIGFP super senior credit default swap portfolio valuation process and oversight thereof were not adequate to prevent or detect misstatements in the accuracy of management's fair value estimates and disclosures on a timely basis, resulting in adjustments for purposes of AIG's December 31, 2007 consolidated financial statements. In addition, this deficiency could result in a misstatement in management's fair value estimates or disclosures that could be material to AIG's annual, or interim consolidated financial statements that would not be prevented or detected on a timely basis.

80.     In connection with the filing of the 2007 Form 10-K, Defendant Sullivan reported to the market that Defendant Cassano, head of AIGFP, the entity responsible for the Company's Credit swap portfolio, had agreed to leave AIG.

81.     On May 8, 2008, after the market close, AIG announced its results for the quarter ended March 31, 2008, finally acknowledging the true extent of the losses AIG had not previously been disclosed.

82.     The Company's net loss for the quarter was $7.8 Billion. According to the press release, "[i]ncluded in the first quarter 2008 net loss and adjusted net loss was a pre-tax charge of approximately $9.11 billion ($5.92 billion after tax) for a net unrealized market valuation loss related to the AIG Financial Products Corp. (AIGFP) super senior credit default swap portfolio."

83.     The Company also disclosed that it had sustained "capital losses of $6.09 billion ($3.96 billion after tax) primarily from other-than-temporary impairment charges...result[ing] primarily from the severe, rapid declines in market values of certain residential mortgage backed securities and other structured securities in the first quarter for which AIG concluded it could not reasonably assert that the recovery period would be temporary."

84.     Even as investors were just beginning to learn the extent of the Company's subprime exposure, outside experts continued to question AIG's valuations, with some believing actual losses on the CDS portfolio to be closer to $9 to $11 billion. For example, as disclosed in a draft prospectus issued pursuant to an offering of AIG common stock also filed with the SEC on May 8, the Company stated:

> AIG's credit-based analyses estimate potential realized credit impairment pre-tax losses at approximately $1.2 billion to approximately $2.4 billion. Other types of analyses or models could result in materially different estimates. AIG is aware that other market participants have used different assumptions and methodologies to estimate the potential realized credit impairment losses on AIGFP's super senior credit default swap portfolio, resulting in a significantly higher estimate than that resulting from AIG's credit-based analysis. **For example, a third-party analysis provided to AIG that AIG understands uses credit and market value inputs estimates the potential realized pre-tax losses on AIGFP's super senior credit default swap portfolio at between approximately $9 billion and approximately $11 billion. (AIG expresses no view as to the reasonableness of this third-party estimate and does not intend to seek an update of this estimate.)**

85.     These massive losses prompted AIG's simultaneous announcement that it would need to raise $12.5 billion in new capital.

86.     In response to the news, Standard & Poor's immediately downgraded AIG's credit raiding.

87.     As a result of these announcements, shares of AIG stock plummeted on heavy trading to $40.28 per share from the previous close to $44.15, representing an 8.8% loss.

88.     On May 20, 2008, the Company raised over $20 billion in new capital to fortify itself from future losses related to its residential mortgage exposure (a substantial increase from its initial plan announced on May 8, 2008 to raise $12.5 billion), further underscoring the Company's desperate financial condition.

89.    On May 28, 2008, *Marketwatch*, in an article entitled "Citi analyst say AIG's $20 billion capital raise may not suffice," noted a report of Citigroup analyst, Joshua Shanker, advising clients that because AIG may need to funnel capital it is raising to AIGFP, the new capital will not help bolster the Company's balance sheet and that, as a result, regulators may require AIG to raise even more capital for the balance sheet of the holding company.

90.    On June 6, 2008, the *Wall Street Journal* reported that AIG was under investigation by the Securities and Exchange Commission and by criminal prosecutors with the Justice Department in Washington, D.C. and the U.S. Attorney's Office in Brooklyn, New York. According to the article, the subject of the investigation concerned whether AIG had overstated the value of its CDSs. The following week, on June 13, 2008, the *Wall Street Journal* reported that "[o]ne current focus for the regulators is an elaborate presentation held on Dec. 5 at which both AIG Chief Executive Martin Sullivan and former financial-products chief Joseph Cassano tried to assure investors that losses would be minimal."

91.    On Sunday, June 15, 2008, AIG's board of directors convened a special meeting and ousted Defendant Sullivan from the Company.

**RELIANCE: APPLICABILITY OF FRAUD ON THE MARKET PRESUMPTION**

92.    At all relevant times, the market for AIG's common stock was an efficient market that promptly digested current information with respect to the Company from all publicly-available sources and reflected such information in the prices of the Company's securities. Through the Class Period:

(a)    AIG's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

30

(b)    AIG met the requirements of a seasoned issuer to file registration statements under Form S-3; in addition, as a regulated issuer, AIG filed periodic public reports with the SEC and the NYSE;

(c)    AIG regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; Securities analysts and the business press followed and published research reports regarding AIG that were publicly available to investors;

(d)    The market price of AIG securities reacted promptly to the dissemination of public information regarding the Company;

(e)    The average daily trading volume for AIG stock during the Class Period was approximately 16.8 millions hares traded; and

(f)    The Company's market capitalization was approximately $188.3 billion on May 11, 2007 (when AIG announced its financial results for the first quarter of 2007), and $100.3 billion on May 9, 2008 (when AIG announced additional losses for the first quarter of 2008).

93.    As a result of the misconduct alleged herein (including Defendants' misstatements and omissions), the market for AIG securities was artificially inflated. Under such circumstances, the presumption of reliance available under the "fraud-on-the-market" theory applies.

94.    Plaintiff and the other Class members relied on the integrity of the market price for the Company's securities and were substantially damaged as a direct and proximate result of

31

their purchases of AIG securities at artificially inflated prices and the subsequent decline in the price of those securities when the truth was disclosed.

95.     Had Plaintiff and the other members of the Class known of the material adverse information not disclosed by Defendants, or been aware of the truth behind Defendants' material misstatements and omissions, they would not have purchased AIG securities at inflated prices.

96.     Plaintiff is also entitled to the *Affiliate Ute* presumption of reliance to the extent that Defendants' statements concerning AIG's CDS portfolio failed to disclose material facts.

## COUNT I

### Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5
### (Against All Defendants)

97.     Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

98.     This Claim is brought pursuant to Section 10(b) of the Exchange Act and Rule 10-b(5) promulgated thereunder, on behalf of Plaintiff and all other members of the Class, against all Defendants.

99.     Throughout the Class Period, Defendants individually, and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce, the mails and the facilities of a national securities exchange, employed devices, schemes and artifices to defraud, made untrue statements of material fact and/or omitted to state material facts necessary to make statements made not misleading, and engaged in acts, practices and a course of business which operated a fraud and deceit upon Class members, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

100.    Defendants' false and misleading statements and omissions were made with scienter and were intended to and did, as alleged herein, (i) deceive the investing public,

32

including Plaintiff and the other members of the Class; (ii) artificially create, inflate and maintain the market for and market price of the Company's securities; and (iii) cause Plaintiff and the other members of the Class to purchase AIG's securities at inflated prices.

101.    By failing to inform the market of the true risk of loss from AIG's CDS portfolio, and by making other false statements and material omissions, Defendants presented a misleading impression of AIG's finances and prospects. This caused and maintained artificial inflation in the prices of AIG's publicly traded securities throughout the Class Period and until the truth was fully disclosed.

102.    Defendants were individually and collectively responsible for making the statements and omissions alleged herein, by virtue of having prepared, approved, signed and/or disseminated documents which contained untrue statements of material fact and/or making direct statements to the investing public on the conference calls detailed herein.

103.    During the Class Period, the Individual Defendants occupied executive-level positions at AIG and were privy to non-public information concerning the Company. Each of them knew or recklessly disregarded the adverse facts specified herein and omitted to disclose those facts.

104.    As described herein, Defendants made the false statements and omissions knowingly and intentionally, or in such an extremely reckless manner as to constitute willful deceit and fraud upon Plaintiff and other members of the Class who purchased AIG securities during the Class Period. Throughout the Class Period, Defendants had a duty to disclose new, material information that came to their attention, which rendered their prior statements to the market materially false and misleading. There is a substantial likelihood that the disclosure of

these omitted facts would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available about the prospects of the Company.

105.    Defendants' false statements and omissions were made in connection with the purchase or sale of the Company's securities.

106.    In ignorance of the false and misleading nature of Defendants' statements and/or upon the integrity of the market price for AIG securities, Plaintiff and the other members of the class purchased AIG securities at artificially inflated prices during the Class Period. But for the fraud, they would not have purchased the securities at artificially inflated prices.

107.    The market price for AIG securities declined materially upon the public disclosure of the facts that had previously been misrepresented or omitted by the Defendants, as described above.

108.    Plaintiff and the other members of the Class were substantially damaged as a direct and proximate result of their purchases of AIG securities at artificially inflated prices and the subsequent decline in the price of those securities when the truth was disclosed.

109.    This claim was brought within two years after discovery of this fraud and within five years of the making of the statements alleged herein to be materially false and misleading.

110.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and are liable to Plaintiff and the members of the Class, each of whom has been damaged as a result of such violation.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### (Against Defendants Sullivan and Bensinger)

111.    Plaintiff repeats and realleges each and every allegation above as if set forth fully herein. This Claim is brought pursuant to Section 20(a) of the Exchange Act against Defendants

Sullivan and Bensinger on behalf of Plaintiff and all members of the Class who purchased AIG securities during the Class Period.

112.    As alleged herein, AIG is liable to Plaintiff and the members of the Class who purchased AIG securities based on the materially false and misleading statements and omissions set forth above, pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

113.    Throughout the Class Period, the Section 20(a) Defendants were controlling persons of AIG within the meaning of Section 20(a) of the Exchange Act, and culpable participants in the AIG fraud, as detailed herein.

114.    Each of the Section 20(a) Defendants exercised control over AIG during the Class Period by virtue of, among other things, their executive positions with the Company, the key roles they played in the Company's management, and their direct involvement in its day to day operations, including its financial reporting and accounting functions.

115.    In addition to the allegations set forth above, the following allegations demonstrate the Section 20(a) Defendants' control over AIG during the Class Period.

116.    Given their individual and collective responsibilities for managing AIG throughout the Class Period, the Section 20(a) Defendants were regularly presented to the market as the individuals who were responsible for AIG's day-to-day business and operations, as well as the Company's strategic direction.  These Section 20(a) Defendants accepted responsibility for presenting quarterly and annual results, setting guidance for future periods and assuring the market about the state of, and prospects for the Company.  No one else at AIG exercised that degree of responsibility for, or control over, the Company's activities and public statements.

117.    As a result of the false and misleading statements and omissions alleged herein, the market price of AIG securities was artificially inflated during the Class Period.  Under such circumstances, the presumption of reliance available under the "fraud on the market" theory applies, as more particularly set forth above.  Plaintiff and the members of the Class relied upon either the integrity of the market or upon the statements and reports of the Section 20(a) Defendants in purchasing AIG securities at artificially inflated prices.

118.    This claim was brought within two years after the discovery of this fraud and within five years of the making of the statements alleged herein to be materially false and misleading.

119.    By virtue of the foregoing, each of the Section 20(a) Defendants are liable to Plaintiff and the Class, each of whom has been damaged as a result of AIG's underlying violations.

**WHEREFORE,** Plaintiff prays for relief and judgment, as follows:

A.    Declaring this action to be a proper class action pursuant to Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B.    Awarding Plaintiff and the members of the Class compensatory damages;

C.    Awarding Plaintiff and the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees and other costs; and

D.    Awarding such other relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury in this action for all issues so triable.

Dated:  June 16, 2008

**BARRACK, RODOS & BACINE**

A. Arnold Gershon (AG – 3809)
Regina M. Calcaterra (RC- 3858)
1350 Broadway
Suite 1001
New York, New York 10018
Tel.:  (212) 688-0782
Fax:  (212) 688-0783

- and -

Leonard Barrack
Daniel E. Bacine
Jeffrey W. Golan
Robert A. Hoffman
**BARRACK, RODOS & BACINE**
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA  19103
Tel.:  (215) 963-0600
Fax:  (215) 963-0838

Attorneys for Plaintiff

*Attorneys for Plaintiff, Maine Public
Employees Retirement System*

37

**BARRACK, RODOS & BACINE**
Attorneys at Law

## <u>SWORN CERTIFICATION</u>

I, John C. Milazzo, hereby certify and swear as follows:

1.      I am the Chief Deputy Executive Director and General Counsel of the Maine

Public Employees Retirement System ("MainePERS") and am authorized to submit this

certification on its behalf.

2.      I have reviewed the complaint against American International Group, Inc.

("AIG") and others and have authorized its filing.

3.      MainePERS did not purchase AIG securities at the direction of Barrack, Rodos &

Bacine or in order to participate in any private action under the federal securities laws.

4.      MainePERS is willing to serve as a lead plaintiff and representative party on

behalf of a class, including providing testimony at deposition and trial, if necessary.

5.      MainePERS's transactions in AIG securities that are the subject of this action, as

reported by MainePERS's custodian, are set forth in Exhibit A attached hereto.

6.      During the three years prior to the date of this certification, MainePERS has

sought to serve as a representative party on behalf of a class in the following actions brought

under the federal securities laws:

*In re New Century*, Case No. 2:07-cv-00931 DDP (JTLx) (C.D.Cal.)

*In re Eli Lilly and Company Securities Litigation*, Civil Action No. 1:07-cv-01310-JBW
(E.D.N.Y.)

*In re Amgen Inc. Securities Litigation*, Case No. CV 07-2536 PSG (PLAx) (C.D.Cal.)

7.      MainePERS will not accept any payment for serving as a representative party on

behalf of a class beyond its *pro rata* share of any recovery, except as ordered or approved by the

**BARRACK, RODOS & BACINE**
Attorneys at Law

Court.

    I declare under penalty of perjury that the foregoing is true and correct.  Executed this

16th day of June 2008.

                                John C. Milazzo

2

Maine Public Employees' Retirement System
American International Group, Inc.
Ticker: AIG; Cusip: 026874107
Class Period: May 11, 2007-May 9, 2008

| Date | Transaction | No. of Shares | Price |
|------|-------------|---------------|-------|
| 6/5/2007 | BUY | 16,400 | $72.3874 |
| 6/5/2007 | BUY | 1,700 | $72.3113 |
| 6/6/2007 | BUY | 27,600 | $72.1748 |
| 6/6/2007 | BUY | 900 | $72.1950 |
| 6/7/2007 | BUY | 13,400 | $71.9243 |
| 6/25/2007 | BUY | 18,600 | $71.1205 |
| 6/25/2007 | BUY | 4,400 | $71.0050 |
| 7/19/2007 | BUY | 16,690 | $69.6860 |
| 7/26/2007 | BUY | 2,600 | $67.4081 |
| 8/6/2007 | SELL | 49,100 | $63.6811 |
| 9/13/2007 | BUY | 3,900 | $64.9316 |
| 9/20/2007 | BUY | 19,200 | $67.2565 |
| 9/20/2007 | BUY | 2,300 | $67.2510 |
| 9/24/2007 | BUY | 11,400 | $66.9910 |
| 9/24/2007 | BUY | 7,500 | $66.9474 |
| 9/25/2007 | BUY | 9,100 | $66.9420 |
| 10/23/2007 | BUY | 4,300 | $63.8499 |
| 10/23/2007 | BUY | 4,100 | $63.8499 |
| 10/23/2007 | BUY | 2,100 | $63.7000 |
| 10/23/2007 | BUY | 500 | $63.7288 |
| 10/25/2007 | BUY | 3,600 | $59.8280 |
| 11/16/2007 | BUY | 3,800 | $56.6770 |
| 11/19/2007 | BUY | 2,100 | $55.4254 |
| 11/20/2007 | BUY | 1,600 | $54.7747 |
| 11/20/2007 | BUY | 2,200 | $54.9464 |
| 11/21/2007 | BUY | 3,700 | $51.1200 |
| 11/21/2007 | BUY | 100 | $51.3000 |
| 11/29/2007 | BUY | 1,700 | $57.1614 |
| 11/29/2007 | BUY | 1,000 | $57.2000 |
| 11/29/2007 | BUY | 700 | $57.2113 |
| 11/29/2007 | BUY | 1,100 | $57.1805 |
| 11/29/2007 | BUY | 800 | $57.0784 |
| 11/29/2007 | BUY | 700 | $57.0885 |
| 12/3/2007 | BUY | 1,400 | $56.7994 |
| 12/3/2007 | BUY | 100 | $56.7710 |
| 12/3/2007 | BUY | 100 | $56.6750 |
| 12/3/2007 | BUY | 1,100 | $56.8533 |
| 12/3/2007 | BUY | 1,500 | $56.6971 |
| 12/5/2007 | BUY | 500 | $57.7500 |
| 12/5/2007 | BUY | 700 | $57.8686 |
| 12/5/2007 | BUY | 600 | $57.8540 |
| 12/5/2007 | BUY | 1,300 | $58.5667 |
| 12/5/2007 | BUY | 1,000 | $57.9724 |
| 12/5/2007 | BUY | 200 | $58.1725 |
| 12/6/2007 | SELL | 1,600 | $59.9984 |
| 12/6/2007 | SELL | 12,100 | $59.7977 |
| 12/6/2007 | SELL | 15,300 | $61.2882 |
| 12/6/2007 | SELL | 3,200 | $60.2334 |

Maine Public Employees' Retirement System
American International Group, Inc.
Ticker: AIG; Cusip: 026874107
Class Period: May 11, 2007-May 9, 2008

| 12/11/2007 | SELL | 95,100 | $61.1211 |
|---|---|---|---|
| 12/12/2007 | SELL | 4,400 | $59.2159 |
| 12/27/2007 | BUY | 400 | $58.6875 |
| 12/27/2007 | BUY | 900 | $58.7458 |
| 12/27/2007 | BUY | 600 | $58.7071 |
| 12/27/2007 | BUY | 700 | $58.7131 |
| 1/10/2008 | BUY | 200 | $56.4024 |
| 1/10/2008 | BUY | 900 | $56.3951 |
| 1/10/2008 | BUY | 500 | $56.4227 |
| 1/10/2008 | BUY | 500 | $56.3983 |
| 1/10/2008 | BUY | 100 | $56.4501 |
| 1/10/2008 | BUY | 700 | $56.3974 |
| 1/25/2008 | BUY | 2,600 | $53.4240 |
| 1/31/2008 | BUY | 800 | $54.1537 |
| 1/31/2008 | BUY | 700 | $54.1320 |
| 1/31/2008 | BUY | 600 | $54.0064 |
| 1/31/2008 | BUY | 1,100 | $54.2579 |
| 2/8/2008 | BUY | 300 | $50.2845 |
| 2/8/2008 | BUY | 300 | $50.2758 |
| 2/8/2008 | BUY | 1,000 | $50.2424 |
| 2/8/2008 | BUY | 100 | $50.3097 |
| 2/11/2008 | BUY | 100 | $44.8842 |
| 2/11/2008 | BUY | 100 | $44.8367 |
| 2/11/2008 | BUY | 800 | $44.9122 |
| 2/11/2008 | BUY | 100 | $44.8626 |
| 2/11/2008 | BUY | 1,600 | $45.0312 |
| 2/11/2008 | BUY | 3,600 | $45.0673 |
| 2/22/2008 | SELL | 24,000 | $47.5167 |
| 2/26/2008 | BUY | 700 | $51.3008 |
| 2/27/2008 | BUY | 3,200 | $51.6330 |
| 3/14/2008 | BUY | 600 | $41.0222 |
| 3/14/2008 | BUY | 1,100 | $41.0718 |
| 3/14/2008 | BUY | 1,400 | $41.0355 |
| 3/14/2008 | BUY | 800 | $41.0403 |
| 3/17/2008 | SELL | 82,000 | $39.5419 |
| 3/18/2008 | SELL | 23,800 | $42.2774 |
| 3/20/2008 | BUY | 400 | $43.7393 |
| 3/20/2008 | BUY | 200 | $43.7031 |
| 3/20/2008 | BUY | 1,500 | $43.3473 |
| 3/20/2008 | BUY | 800 | $43.5388 |
| 3/20/2008 | BUY | 400 | $43.7034 |
| 4/2/2008 | BUY | 2,500 | $47.5375 |
| 4/2/2008 | BUY | 1,200 | $47.8893 |
| 4/15/2008 | BUY | 19,470 | $43.7438 |
| 4/25/2008 | BUY | 2,800 | $46.7199 |